J-S79032-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: R.L.O., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.L.O., FATHER | : | No. 1785 EDA 2017 |

Appeal from the Order Entered May 4, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000715-2016,
CP-51-DP-0002120-2013

| | | |
|---|---|---|
| IN THE INTEREST OF: M.X.O., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.L.O., FATHER | : | No. 1790 EDA 2017 |

Appeal from the Order Entered May 4, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000716-2016,
CP-51-DP-0002121-2013

BEFORE:  GANTMAN, P.J., LAZARUS, J., and OTT, J.

MEMORANDUM BY GANTMAN, P.J.:             **FILED DECEMBER 12, 2017**

Appellant, H.L.O. ("Father"), appeals from the orders entered in the Philadelphia County Court of Common Pleas Family Court Division, which granted the petitions of the Department of Human Services ("DHS") for involuntary termination of Father's parental rights to his minor children, R.L.O. and M.X.O. ("Children").  We affirm.

In its opinion, the Family Court fully and correctly set forth the relevant facts and procedural history of the case.  Therefore, we have no

reason to restate them.

Father raises three issues for our review:

> DID THE [TRIAL] COURT…ERR IN FINDING THAT [DHS] HAD MET ITS BURDEN IN PROVING GROUNDS UNDER 23 PA.C.S.A. §§ 2511(A)(1) AND (2) BY "CLEAR AND CONVINCING EVIDENCE"?
>
> DID THE [TRIAL] COURT…ERR IN FINDING THAT DHS HAD MET ITS BURDEN TO PROVE THAT TERMINATION WOULD BE IN [CHILDREN'S] BEST INTERESTS, UNDER [23 PA.C.S.A.] § 2511(B)?
>
> DID THE [TRIAL] COURT…ERR IN DENYING DUE PROCESS AND EQUAL PROTECTION OF LAW TO [FATHER] AS GUARANTEED BY THE CONSTITUTIONS OF THE UNITED STATES AND OF THE COMMONWEALTH OF PENNSYLVANIA?

(Father's Brief at 4).

Appellate review of termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).

> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

> *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191-92 (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

DHS filed a petition for the involuntary termination of Father's parental rights to Children on the following grounds:

**§ 2511. Grounds for involuntary termination**

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of

- 3 -

at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b)** **Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and

welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P., supra* at 1117.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his… parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

Termination under Section 2511(a)(1) involves the following:

> To satisfy the requirements of [S]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,
>
> > Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights

- 5 -

> may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.
>
> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his… conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted). Regarding the six-month period prior to filing the termination petition:

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his… parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.,* (797 A.2d. 326, 337 (Pa.Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full

parental responsibilities." ***Id.*** at 340. The fundamental test in termination of parental rights under Section 2511(a)(2) was long ago stated in the case of ***In re Geiger***, 459 Pa. 636, 331 A.2d 172 (1975), where the Pennsylvania Supreme Court announced that under what is now Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." ***In Interest of Lilley***, 719 A.2d 327, 330 (Pa.Super. 1998).

"Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." ***In re Z.P., supra*** at 1118.

"[T]o terminate parental rights under Section 2511(a)(8), the following factors must be demonstrated: (1) [t]he child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." ***In re Adoption of M.E.P.***, 825 A.2d 1266, 1275-76 (Pa.Super. 2003). "Section 2511(a)(8) sets a 12–month time frame for a

parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa.Super. 2003). Once the 12–month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time. *Id.* Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services. *In re Adoption of T.B.B.*, 835 A.2d 387, 396 (Pa.Super. 2003); *In re Adoption of M.E.P., supra*.

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and have his…rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert [himself] to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his… ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and

emotional needs.

***In re B.,N.M., supra*** at 855 (internal citations omitted). "[A] parent's basic constitutional right to the custody and rearing of his…child is converted, upon the failure to fulfill his…parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." ***Id.*** at 856.

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Allan L. Tereshko. Sr., we conclude Father's issues merit no relief. The Family Court opinion comprehensively discusses and properly disposes of the questions presented. (***See*** Family Court Opinion, filed July 18, 2017, at 1-29) (finding: **(1)** evidence demonstrated Father failed to comply with single case plan objectives to obtain and maintain housing for Children and address his drug and alcohol abuse issues; at termination hearing, CUA manager, Ms. Strauss, credibly testified, *inter alia*: (a) Father lived in Florida and had not moved back to Philadelphia;(b) Father visited Children three or four times between May and December 2016; and (c) Father did not inquire about Children's health, doctor's appointments, or education and development; throughout termination proceedings, Father repeatedly tested positive for drug use and failed to enroll in substance abuse treatment; Father failed to present court with copy of assessment from mental health, drug, and alcohol treatment in Florida; Father presented no information that he was ready to

reunify with his Children; Father cannot or will not remedy the repeated and continued neglect and conditions which brought Children into supervision, or fulfill his parental responsibilities; **(2)** Ms. Strauss credibly testified Children were not bonded to Father; Children look to their maternal grandmother, who is their foster parent, for safety, comfort, and daily needs; Ms. Strauss credibly opined Children would not suffer irreparable harm if Father's parental rights were terminated, and that termination of Father's parental rights is in Children's best interest; **(3)** court scheduled hearing to show cause on DHS' petition for involuntary termination of Father's parental rights for August 22, 2016; court continued August 22, 2016 hearing to allow for proper service to Father; Father attended next permanency review hearing on December 20, 2016; Father and his attorney were personally served with copy of permanency review order, which noted next scheduled court date would be a Contested Goal Change Hearing scheduled for May 4, 2017; Father had opportunity to participate, testify, and present evidence on his behalf during termination proceedings; Father participated in termination proceedings and also testified; Father's attorney was present at hearing and presented evidence on Father's behalf; Father was not denied a fair and impartial hearing). Accordingly, we affirm based on the Family Court's opinion.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/12/2017

**THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA, PHILADELPHIA COUNTY**
**IN THE COURT OF COMMON PLEAS**

| | |
|---|---|
| **IN THE INTEREST OF:** | : **FAMILY COURT DIVISION** |
| | : **JUVENILE BRANCH-DEPENDENCY** |
| | : |
| **M.X.O., a Minor** | : **CP-51-AP-0000716-2016/CP-51-DP-0002120-2013** |
| | : |
| **R.L.O., a Minor** | : **CP-51-AP-0000715-2016/CP-51-DP-0002121-2013** |
| | : |
| | : |
| **APPEAL OF:** | : **Superior Court No. 1785 EDA 2017 &** |
| | : **1790 EDA 2017** |
| **H.L.O., Father** | |

**O P I N I O N**

**INTRODUCTION**

H.L.O. ("Father"), appeals from the Decree and Order entered by this Court on May 4, 2017, granting the Petition to Involuntarily Terminate his Parental Rights to his Children: ("M.X.O."), a male, born June    2015, and ("R.L.O."), a male, born March 14, 2006, filed by the Department of Human Services ("DHS"), on August    2016 and served on all parties. The Mother of the Children, C.I.H., signed Voluntary Relinquishment Petitions at the hearing on May 4, 2017.

In response to the Decree of May 4, 2017 terminating his parental rights to the Children, Father, by and through his counsel, filed a Notice of Appeal with Statement of Matters Complained of Upon Appeal on June 5, 2017.

1

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

In his Statement of Matters Complained of on Appeal, Father states that the Trial Court erred in the following respects:

1. Finding that H.L.O., Father, had been duly served with notice of the Termination Hearing, as required by the Juvenile Act and by court rules.
2. Finding that DHS had met its burden to prove grounds for termination under 23 Pa.C.S.A. §2511 (a)(1),
3. Finding that DHS had met its burden to prove grounds for termination under 23 Pa.C.S.A. §2511 (a)(2),
4. Finding that DHS had met its burden to prove grounds for termination under 23 Pa.C.S.A. §2511 (a)(5),
5. Finding that DHs had met its burden to prove grounds for termination under 23 Pa.C.S.A. §2511 (a)(8),
6. Finding that DHS had met its burden to prove that termination would be in the Child's best interests, under §2511 (b)(11), and
7. Denying due process of law to Father, as guaranteed by the Constitutions of the Commonwealth of Pennsylvania and of the United States of America.

## PROCEDURAL HISTORY:

On August 31, 2013, the Department of Human Services (DHS) received a General Protective Services (GPS) Report which alleged that the Child, M.X.O., was found crying, wearing only a diaper, and sitting on a curb behind the family's home. The Report alleged that the Children's Mother, C.I.H., was belligerent and intoxicated; that she stated that she was unaware the Child had followed his brother, R.L.O., from the home through the back door; that Mother was diagnosed with bi-polar disorder, anxiety, depression, dissociative disorder, Post-Traumatic Stress Disorder (PTSD) and memory loss; that she had been prescribed medications to treat her mental illnesses; that she was unemployed and received public assistance benefits; and the Children's eighteen-year-old

2

Maternal Aunt, N.D., also resided in the home. This Report was substantiated. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "a").

DHS received further allegations that Mother used drugs and sometimes left the home for hours or overnight, leaving the Children in the care of family members in the home. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "b").

On August 31, 2013, DHS implemented a Safety Plan with Maternal Aunt, N.D., and the Maternal Grandmother, M.R., as the responsible parties. Both were residing at the home at that time and agreed to take care of the boys if Mother appeared incapacitated. DHS learned that Mother was receiving individual therapy, case management, and medication management services at Northeast Community Mental Health. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "c").

On September 12, 2013, In-Home Services (IHS) were implemented by the Community Umbrella Agency (CUA) Northeast Treatment Center (NET). (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "d").

On October 1, 2013, CUA NET developed an Initial Single Case Plan (SCP) for the family. The goal of the plan was to stabilize the family. Mother was present and agreed to submit to random drug screens. Mother also agreed to contact her psychiatrist to notify him that her medication made her drowsy and incapable of appropriately taking care of her Children and to request a change to the medication. Mother further agreed to

3

telephone the Children's Father, H.L.O., who was also present, twice daily for a safety check-in and to also call CUA NET staff every day. DHS agreed to attempt to obtain childcare services for M.X.O. so that Mother could attend intensive outpatient therapy (IOP). (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "e").

On October 15, 2013, DHS received a GPS Report which alleged that Mother had used PCP and lost consciousness, and that she had been admitted to Friends Hospital for mental health treatment; that Father also uses drugs, was also under the influence of drugs, and was caring for the Children in the home; and that there was no food in the home and the Children often stated that they were hungry. The Report further alleged that Maternal Grandmother had taken Maternal Aunt, N.D. to work at 4:00 a.m., unknowingly leaving the Children home alone because Mother had left the home without their knowledge. The Report alleged that on October 14, 2013, Maternal Grandmother and Maternal Aunt filed a Protection from Abuse (PFA) Order against Mother because she had brandished a knife toward them and was breaking items in the home, and that when the police were at the home to serve the PFA, Father was under the influence of drugs and unable to understand what the police were saying, and the Children told the police that they were scared and did not want to reside with Mother. The Report alleged that R.L.O. has a heart murmur and takes medication; that Mother has not taken the Children to the doctor for physicals and treatment; that there is a history of domestic violence between Mother and Father; that Father had hit Mother on the head with a glass bottle while the Children were with them in a vehicle; that Mother had been admitted to Friends Hospital in the past; that Mother sold her food stamps to buy cigarettes; and that

4

Mother has a criminal history and had been previously incarcerated. This Report was determined to be valid. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "f").

Father had been convicted of drug-related offenses on August 30, 1999, May 20, 2003, August 15, 2006, and September 15, 2010. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "g").

On October 16, 2013, DHS went to the family's home. Father, Maternal Grandmother, and Maternal Aunt were present in the home with the Children. Mother remained hospitalized. Father denied any drug use. DHS observed that there was sufficient food in the home, which appeared to be appropriate. DHS developed a Safety Plan which stated that Father would be the primary caregiver for the Children while Mother was hospitalized. The Children's sibling, J.H., went to reside with his father and paternal family members. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "h").

On October 17, 2013, Maternal Grandmother and Maternal Aunt moved from the home. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "i").

On October 21, 2013 and October 22, 2013, DHS had a telephone conference with Mother, CUA NET and Friends Hospital staff. Friends Hospital staff recommended that Mother enter a 28-day inpatient drug treatment program. Mother refused to receive inpatient drug treatment and stated that she wanted to participate in an intensive outpatient treatment program upon her discharge on October 22, 2013. (Exhibit "A"

5

Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "j").

Father's speech was delayed and slurred when DHS spoke with him on the telephone on October 22, 2013. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "k").

On October 22, 2013, DHS obtained an Order of Protective Custody (OPC) for the Children and placed them with Maternal Grandmother, M.R. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "l").

A Shelter Care Hearing was held on October 24, 2013, before the Honorable Allan L. Tereshko. Legal and Physical Custody of the Children was transferred to DHS. Placement of the Children is in Foster Care with Maternal Grandmother, M.R. Maternal grandmother has a PFA against Mother. This is a CUA case. Mother and Father are referred to CEU for a forthwith drug screen, assessment and monitoring. Mother is to have weekly supervised visits at the Agency. Father is to have weekly unsupervised visits. If Father renders a positive drug screen today, then his visits are to be supervised at the Agency. ACS is to submit a safety affidavit to the Court within 7 days. OPC is lifted. (Shelter Care Order, 10/24/2013).

On October 25, 2013, Mother tested positive for barbiturates, PCP, and benzodiazepines. On October 30, 2013, she tested positive for barbiturates and benzodiazepines. On December 20, 2013, she tested positive for opiates, benzodiazepines, and PCP. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "n").

6

A continuance was granted on October 30, 2013 by the Honorable Allan L. Tereshko. Children are to remain with Maternal Grandmother, M.R. Father to continue to have liberal unsupervised visits in M.R.'s home and Mother to continue with weekly supervised visits at the Agency. Mother and Father are re-referred to CEU for forthwith drug screen and assessment along with 2 random drug screens prior to next court hearing. (Continuance Order, 10/30/2013).

Mother failed to keep her October 28, 2013, and December 18, 2013, appointments for an assessment at the CEU and did not reschedule. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "o").

On October 31, 2013, Father's drug screen was negative. Father failed to keep his January 6, 2014, appointment for an assessment at the CEU and did not reschedule. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "p").

An Adjudication Hearing was held on January 14, 2014, before the Honorable Allan L. Tereshko. Both Children were adjudicated Dependent. Temporary legal custody is transferred to Maternal Grandmother, M.R., residing in Philadelphia, PA . Physical custody to Maternal Grandmother, M.R. Parents may have weekly supervised visits at the Agency. The case is supervised by CUA through NET. A Report of non-compliance from CEU is incorporated by reference to both parents. Both parents re-referred to CEU for a forthwith drug screen and assessment with two random drug screens prior to next court date. (Orders of Adjudication—Child Dependent, 01/14/2014).

7

On January 14, 2014, and March 10, 2014, Mother tested positive for PCP and benzodiazepines. She failed to keep her appointments for a CEU assessment on February 11, 2014, and March 11, 2014. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "r").

On January 24, 2014, CUA NET revised the SCP. The goal of the plan was to stabilize the family. Father's objectives included maintaining safe and stable housing; attending all CEU appointments; and completing two random drug screens prior to next court date. Father was invited to participate in the development of the plan, however he did not attend the meeting and did not participate by telephone. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "s").

On March 19, 2014, Father participated in a CEU assessment, which did not recommend that he receive treatment at that time. Between January 14, 2014, and April 3, 2014, Father had four drug screens which tested negative. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "t").

A Permanency Review Hearing was held on April 10, 2014, before Master William T. Rice. It was ordered that legal custody of the Children remains with DHS, and placement remains with Maternal Grandmother, M.R. No special services needed. Children attend Smedley Elementary School. DHS has entered into evidence Mother's non-compliance as to the CEU Report. Father's negative screens have also been entered into evidence. Father referred to BHS and re-referred to CEU for a forthwith drug screen,

8

and 3 randoms prior to next court date. Both parents present at hearing. (Permanency Review Order-Non Placement, 4/10/2014).

On April 29, 2014, Mother was arrested and charged with forgery and related offenses. She pled guilty to the charges of conspiracy and theft, and she was sentenced to probation. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "v").

Father did not comply with the referral to BHS. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "w").

On April 24, 2014, Father was arrested and on June 20, 2014, he pled guilty to the charges of retail theft, conspiracy, and theft. He was sentenced to three years of probation: MC-51-CR-0013213-2014 (Secure Court Summary, p.9-10).

A continuance was granted on June 26, 2014 by the Honorable Kevin M. Dougherty. Case remains status quo. (Continuance Order, 6/26/2014).

A Permanency Review Hearing was held on July 30, 2014, before the Honorable Allan L. Tereshko. The Court ordered that legal custody and physical custody of the Children remains with Maternal Grandmother, M.R., supervised by DHS. Drug results were made available to the Court. Father tested positive for marijuana and PCP. Mother refused to take a drug screen. Parents failed to return back to court once case was recalled. Parent's visits with the Children are now suspended until parents report to CEU for drug screens and screens become negative. Parents are not to visit Children at the home of Maternal Grandmother. CUA services to remain. Parents re-referred to CEU

9

for assessment and screen with four random drug screens prior to next Court date. (Permanency Review Order-Non Placement, 7/30/2014).

On July 30, 2014, and September 25, 2014, Father tested positive for marijuana and PCP. On October 14, 2014, he tested positive for marijuana and opiates. He failed to keep his appointment for a CEU assessment on October 28, 2014, and did not reschedule. He also did not enroll in substance abuse treatment. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "z").

On September 24, 2014, CUA NET revised the SCP. The goal of the plan was to stabilize the family. Father's objectives included scheduling an appointment for himself with CEU; and completing random drug screens; and providing Maternal Grandmother with the Children's medical insurance cards. Father was present at the meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "bb").

In or about the fall of 2014, Father relocated to Florida and his whereabouts became unknown to DHS. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "cc").

A continuance was granted on October 8, 2014, by the Honorable Allan L. Tereshko. Case remains status quo. (Continuance Order, 10/08/2014).

A Permanency Review Hearing was held on November 26, 2014, before Master William T. Rice. It was ordered that legal custody and physical custody of the Children remains with Maternal Grandmother, M.R., supervised by DHS. CEU Report as to parents incorporated by reference into the record. Parents referred to CEU for an

10

assessment and forthwith drug screen and 3 randoms prior to next Court date. Parent's visitation remains suspended. Parents are not to visit Children at the home of Maternal Grandmother. Neither parent was present at the hearing. (Permanency Review Order-Non Placement, 11/26/2014).

On January 28, 2015, CUA NET revised the SCP. The goal of the plan was to stabilize the family. Father's objectives included attending all CEU appointments; completing three random drug screens prior to next court date; complying with the court order; and making his whereabouts known to CUA NET and participating in planning for the Children's care. Neither parent participated in the meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "ff").

A continuance was granted on February 26, 2015, by the Honorable Margaret T. Murphy. Case remains status quo. (Continuance Order, 2/26/2015).

A continuance was granted on March 27, 2015 by the Honorable Allan L. Tereshko. Case remains status quo. (Continuance Order, 03/27/2015).

A Permanency Review Hearing was held on May 25, 2015, before the Honorable Allan L. Tereshko. The Court ordered that legal custody and physical custody of the Children remains with Maternal Grandmother, M.R., supervised by DHS. Children are medically up to date. Mother has appropriate housing and attending Nueva Vida. Father resides in Florida. Supervision to stand. Children to remain in TLC with Maternal Grandmother. Mother is referred to CEU for an assessment and forthwith drug screen and 3 randoms prior to next Court date. CUA to do PLS on Father. If Father is in jurisdiction, Father referred to CEU for forthwith full drug and alcohol screen. Mother

11

was present at the hearing. Father did not attend. (Permanency Review Order-Non Placement, 5/27/2015).

On 6/15/2015, Mother tested positive for marijuana. On 5/27/2015, 9/2/2015, and 9/8/2015 Mother tested positive for marijuana and benzodiazepines, and PCP. Mother failed to keep her appointment for a CEU assessment on 6/25/2015 and did not reschedule. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "hh").

On June 29, 2015, CUA NET revised the SCP. The goal of the plan was to stabilize the family. Father's objectives included complying with the court order; complying with the CEU assessment treatment recommendations; and providing documentation of his treatment to CUA NET. Neither parent attended the meeting, nor participated in the development of the plan. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "ii").

A continuance was granted on August 13, 2015, by the Honorable Allan L. Tereshko. Case remains status quo. (Continuance Order, 8/13/2015).

A Permanency Review Hearing was held on September 18, 2015, before the Honorable Allan L. Tereshko. The Court ordered that legal custody and physical custody of the Children remains with Maternal Grandmother, M.R., supervised by DHS. Children are doing well in the home of Maternal Grandmother. Mother is re-referred to CEU for a forthwith drug screen and 3 randoms prior to next Court date and follow CEU recommendations. PLS to be conducted on Father. Mother was present at the hearing. Father did not attend. (Permanency Review Order-Non Placement, 9/18/2015).

12

On 9/18/2015 Mother tested positive for marijuana and benzodiazepines. On 10/30/2015 Mother tested positive for marijuana and benzodiazepines, and PCP. She did not keep her appointments for a CEU assessment on 10/06/2015, and 11/30/2015 and did not reschedule. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "kk").

A Permanency Review Hearing was held on December 9, 2015, before the Honorable Allan L. Tereshko. The Court ordered that legal custody transfers to DHS. The Children to be placed in Foster Care (Kinship) with Maternal Grandmother, M.R. Mother to have supervised visits with Children at Agency if she has a negative drug screen today. Father to have supervised visits by Agency or Maternal Grandmother. Children are residing with Maternal Grandmother. Mother and Father are re-referred to CEU for a forthwith drug screen and 3 randoms prior to next Court date and follow CEU recommendations. Mother was present at the hearing. Father did not attend. (Permanency Review Order, 12/09/2015).

On or about December 2015, Father spoke with CUA NET and provided an address for himself in Haines City, Florida. He stated that he was willing to comply with treatment in Florida and that he wanted the Children to be returned to his care. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "nn").

A Permanency Review Hearing was held on February 22, 2016, before the Honorable Allan L. Tereshko. The Court ordered legal custody to remain with DHS, and placement of the Children remains in foster care (Kinship) through CUA NET. Due to a GPS Report as to Maternal Grandmother which was unfounded, Second Chance is to

13

continue with Kinship process to certify. Parents referred back to CEU for an assessment, full drug and alcohol screen and 3 randoms prior to next Court date. Mother's supervised visitation is to remain suspended, until she tests negative for all substances. Children to remain as committed. Parents did not attend hearing. (Permanency Review Order, 2/22/2016).

A Permanency Review Hearing was held on April 19, 2016, before the Honorable Richard J. Gordon. The case to remain status quo. Children are safe in current placement setting as of 4/06/2016. (Permanency Review Order, 4/19/2016).

On March 12, 2016, Mother was arrested and charged with drug-related offenses. She pled guilty on May 20, 2016 to the charge of intentionally possessing a controlled substance and was sentenced to probation. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "pp").

On June 23, 2016, CUA NET visited the Children, and Father arrived at the home during the visit. He stated that he continues to reside in Florida and that he is not currently enrolled in substance abuse treatment. Father provided an address for himself in Kissimmee, Florida. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "qq").

A continuance was granted on June 30, 2016 by the Honorable Allan L. Tereshko to allow proper service of the parents. Children are safe as of 6/23/2016, and case remains status quo. (Continuance Order, 6/30/2016).

On July 11, 2016, DHS revised the SCP. The goal of the plan was changed to Adoption. Father's objectives included complying with the court order; complying with the CEU assessment treatment recommendations; and providing documentation of his

14

treatment to CUA NET; and maintaining contact with the Children via telephone while he lives outside Pennsylvania. Father participated in the meeting by telephone. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 08/09/2016, ¶ "rr").

A continuance was granted on August 22, 2016, by the Honorable Allan L. Tereshko to allow proper service of parents. Case remains status quo. (Continuance Order, 8/22/2016).

A Permanency Review Hearing was held on December 20, 2016 before Master Michael G. Campbell. It was ordered legal custody of the Children to remain with DHS and placement of the Children to remain in Foster Care (Kinship) through A Second Chance. R.L.O. attends Mastery Charter School and is up to date with his medical and dental. He does not receive any special services at this time and is doing well. M.X.O. attends Smedley Elementary School and is up to date with his medical and dental. He does not receive any special services at this time and is doing well. Mother is re-referred to CEU for a forthwith drug screen. Father attended the hearing, and the Court ordered he may have supervised visits with the Children in Philadelphia at the Agency. He is to contact CUA to set up visits as he resides in Florida, and he is to participate in dual diagnosis assessment and provide CUA with documentation. (Permanency Review Order, 12/20/2016).

## TERMINATION HEARING

This Court held a Contested Termination Hearing on May 4, 2017, regarding both Mother and Father's parental rights. This Court Opinion will only address the testimony

15

on DHS's Petition to Terminate Father's Paternal Rights as to the Children. Father, H.L.O., attended the hearing and was represented by counsel. (N.T. 5/04/2017, p.2 at 16).

Counsel for DHS, Bridget Warner, called the first witness to testify, Sharese Strauss, CUA Case Manager-Northeast Treatment Centers. Ms. Strauss stated she was assigned this case in May 2016, and her Agency managed the case until December 20, 2016. The Case Manager assigned to the case at the beginning in August 2013 had left the Agency and was not available, however she did review the file and was able to testify about matters before she was assigned. (N.T. 5/04/2017, p.6 at 3-25).

Ms. Strauss testified the Children came into DHS care because Mother was not supervising the younger child, M.X.O., and he exited the home without anyone's knowledge. Police were called and Mother became belligerent and unruly. Mother and her Children were residing with Maternal Grandmother, M.R., at the time. The Children were placed with Maternal Grandmother, where they remain today. (N.T. 5/04/2017, p. 8 at 3-15).

She testified that objectives were established to deal with Father's drug and alcohol use, need to obtain and maintain housing, and visitation. During the time she supervised this case, Father always lived in Florida. He failed to attend any treatment programs and failed to achieve the objectives required. (N.T. 5/04/2017, p.10 at 2-25; p.11 at 1-24).

Ms. Strauss noted that Father never indicated to her that he would be relocating back to Philadelphia, and she advised him to find drug and alcohol treatment in Florida or participate in the CEU assessment in Philadelphia when he visited. She further discussed

16

the interstate compact process to aid him to deal with the fact that he was in Florida. (N.T. 5/04/2017, p.12 at 3-25).

She noted that Father never provided her with any documentation of participation in any program in Florida, however, he did attend an intake with a behavioral health facility, Park Place Behavioral Health on November 22, 2016, and he did not disclose he had a past history of substance abuse. Therefore, the recommendation was that he did not need treatment. (N.T. 5/04/2017, p.13 at 5-21; p.25 at 7-12).

Regarding visitation and contact with the Children, Ms. Strauss testified Father had frequent telephone contact with the boys, and had participated in supervised visits at the Maternal Grandmother's home, which she supervised. Father would travel from Florida to see the Children and she documented 3 to 4 visits that she supervised from May through December 2016. She noted that Father never inquired about the Children's medical or dental health or appointments, nor did he ask about their education, nor their development. Father never stated nor presented any information to her that he was ready to reunify with his Children. In fact, Father stated that he was okay with his Children living with Maternal Grandmother, however, he still wanted shared custody. (N.T. 5/04/2017, p.13 at 22-25; p.14 at 1-25; p.15 at 1-9).

Regarding a parental bond, Ms. Strauss testified she did not believe Father had a parent/child bond with the boys. He would play and interact with them, however he would never assume responsibility of the Children. On the other hand, she observed Maternal Grandmother's interaction with the Children and that was of a parent/child bond. The boys seemed very happy. They have good grades, and have various extra-curricular activities. They look to Maternal Grandmother for safety and affection and to

17

have their needs met. She opined it would be in the best interests of the Children if the parental rights of both parents were terminated and they be adopted. She further opined the Children would not suffer irreparable harm if Mother and Father's parental rights were terminated. She noted the Children have been with Maternal Grandmother for approximately 4 years, and the parents have never assisted with the educational, medical, transportation, or any other needs of the Children. It was always Maternal Grandmother who accepted responsibility for their needs. (N.T. 5/04/2017, p.15 at 16-25; p.16 at 1-25; p.17 at 1-12).

On cross-examination by Kathleen Kenese, Guardian Ad Litem for the Children, Ms. Strauss stated the Children did not have special needs and are not in need of therapeutic services. (N.T. 5/04/2017, p.18 at 16-25).

Ms. Strauss testified the CEU assessment from January 27, 2016, noted that Father tested positive for marijuana, and the assessment recommended drug and alcohol treatment. Again, she noted Father never provided proof of completing any programs. (N.T. 5/04/2017, p.22 at 7-15; p.23 at 1-7).

On cross-examination by Carla Beggin, Child Advocate, Ms. Strauss testified that both Children, now ages 11 and 6 years old, expressed their desire to remain with their Maternal Grandmother. (N.T. 5/04/2017, p.24 at 6-25).

Maternal Grandmother, M.R., was next to testify. She stated the Children have always lived with her, however, she had them absent the parents for over 3 years. She stated the Mother and the Father, both lived with her and both have substance abuse issues. She stated Father calls the Children from Florida and that he sees them when he comes to Philadelphia whenever there is a Court hearing or on the Children's birthdays.

18

One day he appeared at her house with his eyes dilated and had slurred speech and was sweating profusely, she knew he was intoxicated or on drugs. (N.T. 5/04/2017, p.29 at 19-25; p.30 at 1-13; p.31 at 1-25; p.32 at 1-25; p.33 at 1-4).

On cross-examination by Ms. Kenese, Maternal Grandmother stated Father exhibited the same behavior at his last visit with the Children which occurred on May 2, 2017, just two days before this court date. (N.T. 5/04/2017, p.34 at 17-25; p.35 at 1).

In Maternal Grandmother's opinion, it would not be appropriate for the Children to live with Father. She noted that Father lives with his parents in Florida. He may work for his father's business there, but she is not certain. She noted that Father has never provided financial support for the Children in all the years she had cared for them. (N.T. 5/04/2017, p.35 at 23-25; p.36 at 1-18).

Carla Beggin, Child Advocate, noted that she had met with the Children on April 25, 2017, and they related to her that they want to remain with Maternal Grandmother and still have visits with their Father. (N.T. 5/04/2017, p. 38 at 23-25; p.39 at 1-8; p.40 at 16-19).

Father was next to testify. He stated that he had an assessment in Florida for mental health and drug and alcohol. He stated he provided information regarding that assessment to Ms. Strauss, the CUA Case Manager by email and telephone calls. However, he did not present a copy of the assessment at the bar of the court. (N.T. 5/04/2017, p.41 at 22-25; p.42 at 1-15).

Father then stated he recently sent them $100.00 on Easter. He noted through the years he has sent over two thousand dollars to Maternal Grandmother, he has receipts but did not bring them. (N.T. 5/04/2017, p.42 at 17-25; p.43 at 1-21).

19

On cross-examination by Guardian, Ms. Kenese, Father stated he moved to Florida in October 2014, and was employed and earns four hundred dollars per week. (N.T. 5/04/2017, p.44 at 19-25; p.45 at 1-4).

Mother was next to testify and a colloquy was conducted by her attorney regarding her signing the Voluntary Relinquishment documents. (N.T. 5/04/2017, p.47 at 11-25; p.48 at 1-25; p.49 at 1-25; p.50 at 1-9).

## STANDARD OF REVIEW AND LEGAL ANALYSIS

When reviewing an appeal from a decree terminating parental rights, an appellate Court is limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, an appellate court must accord the hearing judge's decision the same deference that it would give to a jury verdict. The Pennsylvania Superior Court need only agree with a trial court's decision as to any one subsection under 23 P.C.S.A. §2511 (a) in order to affirm a termination of parental rights. *In re D.A.T. 91 A.3d 197 Pa.Super.2014)*.

The standard of review in termination of parental rights cases requires appellate Courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest

20

unreasonableness, partiality, prejudice, bias, or ill-will. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. In re T.S.M., 620 Pa. 602, 71 A.3d 251, 267 (2013) (citations and quotation marks omitted) In re Adoption of C.D.R., 2015 PA Super 54, 111 A.3d 1212, 1215 (2015).

Termination of parental rights is governed by Section 2511 of the Adoption Act 23 Pa.C.S.A. §§ 2101–2938, which requires a bifurcated analysis. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond. *In re L.M.,* 923 A.2d 505, 511 (Pa.Super.2007) (citations omitted). In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1049-50 (2015). The Court need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1050 (2015).

In this case, the Department of Human Services (DHS) first implemented a Safety Plan with Maternal Aunt, N.D., and the Maternal Grandmother, M.R., as the responsible parties for the Children on August 31, 2013. Both parents were also residing at the home

21

at the time and both women agreed to take care of the boys if Mother appeared incapacitated. On or about October 17, 2013, Maternal Grandmother and Maternal Aunt moved out of the home. DHS then spoke with Father on October 22, 2013, and his speech was delayed and slurred. Mother was at Friends Hospital at the time and was to be placed in an inpatient drug treatment program, however she refused. On the same day, DHS obtained an Order of Protective Custody (OPC) for the Children and placed them with Maternal Grandmother, M.R

DHS provided credible evidence regarding Mother's continuous struggles with drugs and mental health issues, and that she was unable to provide safety, care and permanency to the Children. Mother signed Voluntary Relinquishment Petitions at the bar of the court on the same day of the hearing on May 4, 2017.

### A. The Trial Court Properly Found the Court had duly served Father with Notice of the Termination Hearing scheduled on May 4, 2017, pursuant to 23 Pa.C.S.A.§2513 (b)[1]

Father claims the Court erred by not providing him with notice of the termination hearing scheduled on May 4, 2017. This argument is without merit. DHS noted address changes for Father, once in Haines City, Florida on or about December 2015, and another address change to Kissimmee, Florida on June 23, 2016.

A Rule to Show Cause was scheduled on the Petition for Involuntary Termination of Father's Parental Rights on August 22, 2016 at 2:00 p.m. in Courtroom 5B. The

---

[1] 23 Pa.C.S.A.§2513. **Hearing.** (a) **Time.**—The Court shall fix a time for hearing on a petition filed under section 2512 (relating to petition for involuntary termination) which shall not be less than ten days after filing of the petition. (b) **Notice.**—At least ten days' notice shall be given to the parent or parents, putative father, or parent of a minor parent whose rights are to be terminated, by personal service or by registered mail to his or their last known address or by such other means as the court may require. A copy of the notice shall be given in the same manner to the other parent, putative father or guardian of a minor parent whose rights are being terminated.

hearing on August 22, 2016 was continued by this Court to allow proper service of the documents to the parents. Father attended the next Permanency Review Hearing on December 20, 2016, and at the termination of the hearing was personally served with a copy of the Permanency Review Order noting the next scheduled Court date would be a Contested Goal Change Hearing on May 4, 2017. His attorney also received a copy of the Order.

## B. The Trial Court Properly Found that DHS had met its Burden by Clear and Convincing Evidence To Terminate Father's Parental Rights Pursuant to 23 Pa.C.S.A. §2511(a)(1), and (2).[2]

Father's Concise Statement of Matters Complained of on Appeal cited judicial error regarding all sections of 23 Pa.C.S.A. §§2511 (a)(1), (2), (5), and (8). However,

---

[2] 1(a) General Rule.—the rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parenting claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(5) The child has been removed from the care of the parents by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of the parental rights would best serve the needs and welfare of the child.

this Court terminated Father's parental rights solely based on 23 Pa.C.S.A. §§ 2511(a)(1) and (a)(2). Therefore, this Opinion will only address those sections.

The evidence is clear and convincing regarding Father's non-compliance with the FSP objectives to obtain and maintain housing for the Children and to address his drug and alcohol abuse issues. This Court relies on the credible testimony of the CUA Manager, Ms. Strauss, who testified Father lived in Florida and had not attempted to move back to Philadelphia, nor had he tried to pursue interstate remedies as she advised him to. She stated Father had frequent telephone contact with the boys, and had participated in supervised visits at the Maternal Grandmother's home, which she supervised. Father would travel from Florida to see the Children and she documented 3 to 4 visits that she supervised from May through December 2016. She noted that Father never inquired about the Children's medical or dental health or appointments, nor did he ask about their education, nor their development. Father never stated nor presented any information to her that he was ready to reunify with his Children. In fact, Father stated that he was okay with his Children living with Maternal Grandmother, however, he still wanted shared custody.

On July 30, 2014 and September 25, 2014, Father tested positive for marijuana and PCP. On October 14, 2014, he tested positive for marijuana and opiates. He failed to keep his appointment for a CEU assessment on October 28, 2014 and did not reschedule. He also did not enroll in substance abuse treatment. Ms. Strauss testified that Father never provided her with any proof of his compliance with drug and alcohol assessment or treatment.

24

Although Father asserts he obtained an assessment in Florida for mental health and drug and alcohol, and stated he provided information regarding that assessment to Ms. Strauss, the CUA Case Manager by email and telephone calls, he did not present a copy of the assessment at the bar of the court, and this Court finds his testimony incredible.

This Court is not persuaded that Father can or will remedy the repeated and continued neglect and conditions which brought the Children into court supervision. Nor is the Court persuaded that Father will be able to fulfill his parental responsibilities in the future. Based on the evidence presented, this Court found clear and convincing evidence to terminate Father's parental rights pursuant to 23 Pa.C.S.A. §2511(a) (1) and (2).

### C. Trial Court Properly Found that Termination of Father's Parental Rights was in the Child's Best Interest and that DHS Met Its Burden Pursuant to 23 Pa.C.S.A. §2511(b).[3]

After the Court finds that the statutory grounds for termination have been satisfied, it must then determine whether the termination of parental rights serves the best interests of the children pursuant to 2511(b) In re Adoption of C.L.G., 956 A2d 999 (Pa.Super 2008). In terminating the rights of a parent, the Court 'shall give primary consideration to the development, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. §2511(b). One major aspect of the needs and welfare analysis

---

[3] Other Considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1),(6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

concerns the nature and status of the emotional bond between parent and child. In re T.S.M., 71 A3d 251 (Pa. 2013).

This Court finds credible the bonding testimony from Ms. Strauss, Case Manager from CUA, who opined that the Children knew their Father and talked and visited with him, however they were not bonded to him. The Children look to their Maternal Grandmother for safety, comfort and to meet all of their daily needs. She opined that the Children would not suffer irreparable harm if Father's rights were terminated and that termination of Father's parental rights and adoption would be in the best interest of the Children.

### D. Due Process of Law

Father's final argument is that he was denied due process of law as guaranteed by the Constitutions of the Commonwealth of Pennsylvania and the United States. This broad assertion does not state the basis of the denial of his due process rights, and this Court cannot speculate what Father's allegations are. The Court does state that Father was never denied the opportunity to participate, testify, and present evidence on his own behalf. He participated in the termination proceedings and also testified. His attorney was also present at the hearing and presented evidence on Father's behalf. Accordingly, Father was never denied a fair and impartial hearing.

# CONCLUSION

The Court concluded:

With respect to Father, I find that the evidence is clear and convincing that Father has failed to remedy any of the issues that brought these Children into care. He has failed to maintain a parental relationship with his Children. Has failed to take any opportunity offered by the agency to form a parental relationship with the Children.

Has willingly moved away from the family, left his Children with maternal grandmother. Although maternal grandmother had an open relationship and allowed Father to come and go as he pleased, notwithstanding the existence of a formal visitation order, and created an opportunity throughout the time that the Children were in her care for Father to form a parental bond and parental relationship with the Children, he declined to exercise that and take advantage of that offer.

He declined to form a parental bond with the Children. He declined to materially support, provide safety, to provide guidance for the Children. He allowed that to be done by the maternal grandmother.

There were issues of credibility especially regarding his claim that he received certain evaluations and paid certain monies to support the Children knowing that he had a hearing today on the very important issue of termination of his parental rights, failure to bring in the supporting documents which he says he has in his possession suggests to me that the documents just don't exist.

The testimony as to the desires of the Children through the offer of proof of the Children's attorney, the Court received uncontradicted evidence that they wish to be adopted by their maternal grandmother. And wish to continue the family relationship they enjoy with grandmother from a very young age beginning at least back from late 2013 when grandmother received temporary legal custody of the Children.

27

So early on in their life Father did not act on his role as a parent of the Children and allowed maternal grandmother to do so, and then at some point in time he created a relationship with the grandmother and that was done via a petition filed 10/19/2013 which resulted in placement with maternal grandmother which has been in effect for almost three years now.

And during that period of time maternal grandmother has supplied the needs for the Children, supplied all the emotional needs of the Children, all the parental guidance of the Children, provided for their safety, provided for their welfare.

Father occasionally dropped in to see the Children, and at best testimony supports a finding that he has established a friendly relationship with the Children. They acknowledge him, but do not acknowledge him as their parent.

Sections 2511 (a)(1) and (2) are satisfied. The Children were not in his care when removed and therefore, do not have to explore the other sections.

2511 B, the evidence is clear and convincing that there is no parental relationship regarding the Children, therefore, there would be no harm in terminating something that doesn't exist.

As to the best interest of the Children, based on the testimony of the witnesses, the Children are doing well. They're doing well in school. They are loved and cared for by maternal grandmother and it would be in their best interest if this relationship would be permanent and termination of Father's rights.

Father's rights are terminated. The goal is not moved to adoption. I've taken it under advisement...not ready to move to adoption, but Father's rights are terminated.

(N.T. 5/04/2017, p.53 at 1-25; p.54 at 1-25; p.55 at 1-25; p.56 at 1-16).

28

For the foregoing reasons, this Court respectfully requests that the Order of May 4 2017, Terminating Father, H.L.O.'s Parental Rights be AFFIRMED.

BY THE COURT:

_____

**ALLAN L. TERESHKO, Sr. J.**

_July 18, 2017_

**DATE**

29

## CERTIFCATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing OPINION has been served upon the following parties by the manner as designated:

**Family Court Delivery Mail Box**

Bridget Mae Warner, Esq. ACS,
Phila Solicitor's Office
One Parkway, 1515 Arch St, 15th flr.
Philadelphia, PA  19102
DHS Counsel


Neil Marc Krum, Esq.
1533 W. Stiles St.
Phila., Pennsylvania  19121
Counsel for Appellant Father, H.O.


Kathleen Anne Knese, Esq.
Patricia Anne Korey, Esq.
Defenders Association of Phila
1441 Sansom St.
Phila Pennsylvania 19102
Counsel for Children, R.L.O. and M.X.O.
Child Advocates


Carla A. Beggin, Esq.
1800 JFK Blvd., Ste. #300
Phila., Pennsylvania  19103
Guardian Ad Litem, for Children

John. J. Capaldi, Esq.
1812 Fox Chase Rd.
Phila., Pennsylvania  19152
Counsel For C.H. Mother

_Allan L. Tereshko_

**ALLAN L. TERESHKO,  Sr. J.**

7-18-17
**DATE**